## GILL v. ERIE R. CO.

(Supreme Court, Appellate Division, Fourth Department.   May 1, 1912.)

1. CARRIERS (§ 307*)—PASS—LIMITATION OF LIABILITY.

A railroad company may, by express contract, relieve itself of liability for the negligence of its servants to one riding on a free ticket.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1252–1259, 1491; Dec. Dig. § 307.*]

2. CARRIERS (§ 307*)—PASS—EXEMPTION CLAUSE—VALIDITY.

A clause in a railroad pass exempting the company from liability for injury to an employé to whom a pass is delivered in pursuance of a contract of employment is against public policy, and void.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1252–1259, 1491; Dec. Dig. § 307.*]

3. CARRIERS (§ 307*)—EXISTENCE OF RELATION.

A party who was one of several persons comprising an unincorporated traffic association which was employed by several railroad companies, and whose compensation was paid by each company pro rata, was an employé of each company, and especially of a company which recognized the relation by delivering to him a pass in fulfillment of the contract of employment.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1252–1259, 1491; Dec. Dig. § 307.*]

4. CARRIERS (§ 23*)—INTERSTATE COMMERCE—FREE PASS.

The fact that a pass is used in compliance with a long existing contract valid when made does not exempt the parties from the operation of the Interstate Commerce Act Feb. 4, 1887, c. 104, 24 Stat. 379 (U. S. Comp. St. 1901, p. 3154), as amended by Act June 29, 1906, c. 3591, § 1, 34 Stat. 584 (U. S. Comp. St. Supp. 1911, p. 1284), making it a misdemeanor for a common carrier to issue an interstate free pass for passengers except to its employés and certain other classes of persons.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 57–59; Dec. Dig. § 23.*]

5. CARRIERS (§ 316*)—PASS—VALIDITY—PRESUMPTION.

The fact that the issuance of a pass to a party was unlawful if he were not an employé of the carrier issuing the same raised the presumption that he was its employé.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1261, 1262, 1283–1294; Dec. Dig. § 316.*]

6. APPEAL AND ERROR (§ 1066*)—HARMLESS ERROR—INSTRUCTIONS.

In an action for injuries from a collision while the plaintiff was riding on a pass containing a clause exempting the carrier from liability for the negligence of its servants, an instruction that no contract limiting the defendant's liability was good because the statute makes those in charge of the train vice principals, and prohibits a valid contract being made whereby an employé releases his master, if erroneous because the plaintiff did not belong to the class of employés referred to in the statute, was harmless where the undisputed evidence was that he was the defendant's employé, and had received the pass pursuant to his contract of employment; the exemption clause of the pass being invalid in such case, regardless of the statute referred to in the instruction.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 4220; Dec. Dig. § 1066.*]

7. CARRIERS (§ 318*)—INJURIES TO PASSENGERS—EVIDENCE.

The testimony of plaintiff in an action for injuries from a collision while he was riding on a pass that there was no agreement that he

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

should be furnished with a pass, and that his expenses were to be paid by the defendant, and to be charged against it in his expense account, was not in material conflict with his testimony that the pass was part of the consideration of the agreement; the theory being that the defendant had agreed to pay his transportation expenses, and chose to pay his carriage by means of a pass, instead of a ticket.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1270, 1307–1314; Dec. Dig. § 318.*]

8. CARRIERS (§ 322*)—INJURY TO PASSENGERS—VERDICT—INSTRUCTIONS.

Where, in an action for injury to plaintiff from a collision while he was riding on a pass, the court instructed that if, when the plaintiff used the pass, he was on his own pleasure and business, and not on the defendant's business, he could not recover, a verdict for the plaintiff was a finding that, when injured, he was not traveling for his own pleasure and profit, but was engaged in his duties as an employé.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 322.*]

9. CARRIERS (§ 307*)—PASS—LIMITATION—CONSTRUCTION.

Under the rule that, in the absence of flagrant misuse of a pass, the carrier will be confined to the limitation expressed in it, an employé while traveling from a point where he had been engaged in the carrier's business to a place at which his wife was stopping, was not using a pass in violation of a provision contained in it that it was "not good for regular or daily travel between residence and place of business."

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1252–1259, 1491; Dec. Dig. § 307.*]

10. CARRIERS (§ 307*)—WHETHER SERVANT ENGAGED IN DUTY FOR EMPLOYER.

Where a railroad traffic adjuster was injured while traveling to a place where his wife was stopping, the inference was permissible that the trip was not exclusively for his own pleasure and profit, but to enable him to recuperate in order that he might be of better service to his employer, especially where he could, while there, keep in touch with his employer's business.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1252–1259, 1491; Dec. Dig. § 307.*]

11. EVIDENCE (§ 555*)—INJURY TO PASSENGER—EXPERT TESTIMONY—FOUNDATION.

In a passenger's action for injuries from a collision, the admission of testimony of two physicians called as medical experts, as to what in their opinion was the trouble with the injured party at the time they examined him, was improper, where they did not state the facts upon which their opinion was based.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 2376; Dec. Dig. § 555.*]

12. APPEAL AND ERROR (§ 1048*)—HARMLESS ERROR—ADMISSION OF EVIDENCE.

Such testimony was harmless where they subsequently detailed the injured party's condition at the time of the examination, and stated their opinion as to what was then the trouble with him; the reasonable inference being that their opinion was based upon the facts ascertained from the examination and not upon the party's statements to them, especially where the defendant failed to call as witnesses the physicians who had examined him on its behalf.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4140–4145, 4151, 4158–4160; Dec. Dig. § 1048.*]

Appeal from Trial Term, Monroe County.

Action by Clayton E. Gill against the Erie Railroad Company. From a judgment for plaintiff, defendant appeals. Affirmed.

See, also, 134 App. Div. 957, 118 N. Y. Supp. 1108.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Argued before McLENNAN, P. J., and SPRING, KRUSE, ROBSON, and FOOTE, JJ.

John W. Ryan, of Buffalo, for appellant.

Frank W. Brown, of Warsaw, for respondent.

SPRING, J.   The plaintiff was injured in a collision on the defendant's railroad, near the city of Elmira, in the early morning of July 19, 1907.   He was riding in a Pullman sleeper forming a part of a regular west-bound passenger train of the defendant, and he was en route to Warsaw, in the county of Wyoming, in this state.   The negligence of the defendant and the freedom of the plaintiff from contributory negligence were not mooted questions on the trial.   The controversy focuses on other propositions than those usual in actions for personal injuries; and we will now state briefly the salient facts which the record contains.

The plaintiff at the time he was injured was 57 years of age, and his employment after attaining manhood had been continuously with railroad companies and in their freight departments.   There were two associations, one, the Trunk Line Association, in the East, and the other, the Central Association, in the West, engaged in the classification of freight and in the regulation of traffic rates for railroad transportation of freights among certain connecting common carriers.   These two associations, with the concurrence of the interested railroad companies, in 1887 formed an association known as the "Freight or Official Classification Association."   This was an unincorporated organization, apparently without any assets or financial responsibility, except as money was contributed by the 60 or 80 interested railroad companies within the radius of the operations of the association for the purpose of meeting the expenses necessary for the performance of the business devolving upon it.   This association consisted of an executive committee of 12 or 14 members, of which the plaintiff was the chairman and chief executive head.   The railroad companies affected included all those doing interstate business east of the Mississippi river to the Atlantic Coast, and north of the Ohio river, and taking in the New England and Eastern Middle states.   By agreement at the beginning of his employment, the plaintiff's annual salary was fixed at $5,000, "his expenses on the road" were to be paid, and he "was to be furnished, over all the roads represented, annual transportation."   The defendant's predecessor was one of the railroad companies supporting the association, and the defendant has aided in its maintenance since its existence.   The association was intrusted with the arrangement of articles of freight into specified classes and with the adjustment of rates of the shippers over the connecting lines with a view to securing uniformity in the prices to be charged to the shippers, and in order to simplify the handling and transportation of freight over these carrying companies.   In order to provide funds for the payment of the expenses of the committee and the salaries of its members, assessments were levied, as required by the Trunk Line Association and the Central Association, upon the railroad companies affected.   The territory was divided among these two original organ-

izations. The money derived from the assessments imposed was paid to the general agent of the association within the district, and he paid the expenses of the classification association and the salaries of its members. The defendant and its predecessor always had a representative on the commission, and it always contributed its aliquot part to the expenses of its maintenance. The association was, therefore, an agent of these supporting railroad companies, created and maintained to aid in the carrying out of the provisions of the Interstate Commerce Act requiring uniformity of rate charges. Instead of each railroad company attempting to adjust the rate of each shipment to be transported over its line and that of connecting carriers, by arrangement among many of these carriers, the problem was simplified by vesting a committee of those interested with its solution.

Apparently the so-called association had no legal entity, and was dependent for its existence upon the voluntary contributions of the railroad companies. Instead of selecting one man representing these companies to classify the articles of freight and regulate the rate charges, having in mind the complexity and magnitude of the business, they appointed 12 or more men, and dubbed them an association, which was, none the less, their agent in their employ and paid for by them out of a common fund. This plan was more feasible than for each company to arrange with the other companies its ratable proportion of the expenses, and pay directly to the common employés or agents. The plaintiff was the chief executive member of this official classification association from its inception until some time after he was injured. During that time his annual salary of $5,000 and his expenses were paid out of the fund mentioned. He was also furnished an annual pass over its line by each of the 60 or 80 railroad companies in the combination, and the passes were delivered to the general agent of the Trunk Line Association, who delivered them to the plaintiff.

At the time he received the injuries complained of his transportation was by virtue of an annual pass for the year 1907, delivered by the defendant in the customary manner. The pass contained this clause:

"The person accepting and using this pass thereby assumes all risk of accidents and damage to person or property, whether caused by negligence of the company's agents or otherwise."

The defendant contends that the plaintiff accepted the pass knowing it contained this provision, and it is therefore exonerated from liability for his injuries sustained while riding free on its road. The solution of the proposition depends on the fact whether the plaintiff was a passenger or an employé of the defendant, receiving the pass as a part consideration of his employment.

[1] If the plaintiff was a passenger riding gratuitously on this pass, he cannot recover, for it is well settled that a railroad company may by express contract relieve itself from liability for the negligence of its servants to one who rides on a free ticket containing such an exemption. Bissell v. N. Y. C. & H. R. R. R. Co., 25 N. Y. 442, 82

Am. Dec. 369; Ulrich v. N. Y. C. & H. R. R. R. Co., 108 N. Y. 80, 15 N. E. 60, 2 Am. St. Rep. 369; Boering v. Chesapeake B. R. R. Co., 193 U. S. 442, 24 Sup. Ct. 515, 48 L. Ed. 742; Quimby v. Boston & Maine Ry. Co., 150 Mass. 365, 23 N. E. 205, 5 L. R. A. 846.

[2] If, however, the plaintiff was an employé of the defendant and the pass was delivered to him in pursuance of the contract of employment, the defendant is liable. Vroom v. N. Y. C. & H. R. R. R. Co., 129 App. Div. 858, 115 N. Y. Supp. 1063, affirmed 197 N. Y. 588, 91 N. E. 1121; Halley v. N. Y. C. & H. R. R. R. Co., 133 App. Div. 920, 117 N. Y. Supp. 1136. See Record 2,453, January, 1909, A. D. Second Department. If such was the relation: (1) The pass was not free, but founded on a good consideration. Dempsey v. N. Y. C. & H. R. R. R. Co., 146 N. Y. 290, 40 N. E. 867; Vick v. N. Y. C. & H. R. R. R. Co., 95 N. Y. 267, 47 Am. Rep. 36. (2) The defendant had no right to import into the ticket a clause impairing the effect of the agreement. (3) Such an exemption is against public policy. Johnston v. Fargo, 184 N. Y. 379, 77 N. E. 388, 7 L. R. A. (N. S.) 537, 6 Ann. Cas. 1; Thompson v. Knights of Maccabees, 189 N. Y. 294, 301, 82 N. E. 141, 13 L. R. A. (N. S.) 314, 121 Am. St. Rep. 879, 12 Ann. Cas. 552.

[3-5] We think the plaintiff was an employé of the defendant. The latter so recognized that relation by delivering the pass in fulfillment of the contract of employment. The pass on which he was riding when injured was delivered and accepted in violation of the Interstate Commerce Act, as amended, unless the plaintiff was the employé or agent of the defendant. The amendment of that act passed June 29, 1906 (chapter 3591, 34 Stat. L. 584), in section 1 prohibits a common carrier issuing or giving any interstate free pass or transportation for passengers, "except to its employés and their families, its officers, agents," etc. Any common carrier violating the provision, and any person not within any of the excepted classes, using such free pass or ticket, "shall be guilty of a misdemeanor." Section 1. If the plaintiff was otherwise within the inhibition of the act referred to, the fact that the pass was issued in compliance with a long existing contract, valid when made, would not exempt him from the prohibitive statute. Louisville & Nashville R. R. Co. v. Mottley, 219 U. S. 467, 478, 31 Sup. Ct. 265, 55 L. Ed. 297 et seq. The presumption is, therefore, that the pass was issued and used lawfully, rather than in violation of the express provision of the statute making the offense a misdemeanor. The association of which the plaintiff was the executive head was, in effect, a department representing the numerous railroad companies maintaining it. Instead of each company providing a department or officer in direct connection with its own operating force, it united with other railroad companies in appointing men, representing all of them, charged with the duty of carrying on the classification and adjustment of freights. The plan was devised and carried on for their common benefit and at their common expense. While there was an intermediary association also representing the confederated companies which actually disbursed the

money to the plaintiff for his salary, it was still supplied by the defendant and those allied with it in the enterprise.

The trial judge submitted three specific questions to the jury as follows: (1) Was the plaintiff an employé of the defendant? (2) Was the pass a gift or gratuity to him? (3) Was it issued and delivered to the plaintiff pursuant to his contract for service and as part payment thereunder? The jury answered the first and third in the affirmative, and the second in the negative; and found a general verdict for the plaintiff.

[6] In submitting the question of the plaintiff's employment to the jury, the court used this language:

"Was this plaintiff in the employment of the defendant, under the evidence in this case? If so, and it issued to him a pass, then no contract limiting its liability is good, because the Legislature has seen fit to make those in charge of the train vice principals while engaged in that service, and further prohibiting and preventing a valid contract whereby the employé releases from liability the corporation, his master. The language is this: 'And no contract, receipt, rule or regulation between an employé and a railroad corporation or receiver shall exempt or limit the liability of such corporation or receiver,' in case of negligence."

To which an exception was taken. I doubt whether the plaintiff was an employé within the provisions of the Barnes Act (section 42a of the Railroad Law [Laws 1906, c. 657]), quoted in the charge. It has been held that acts similar to the Barnes Act were intended to protect men actually engaged in the business of operating a railroad. Railway Co. v. Medaris, 60 Kan. 151, 55 Pac. 875; Lavallee v. St. P., M. & M. R. R. Co., 40 Minn. 249, 41 N. W. 974; Deppe v. C., R. I. & P. Ry. Co., 36 Iowa, 52; Missouri Pacific R. R. Co. v. Mackey, 127 U. S. 205, 8 Sup. Ct. 1161, 32 L. Ed. 107. The plaintiff, riding in a sleeping car, was subjected to the same danger which attends a passenger in such a car. He was not exposed to the perils peculiarly incident to the operation of a railroad, and it was to men engaged in such hazards in the performance of their daily work that the Barnes Act was intended to afford some measure of indemnity. However, the error, if such it was, was not very important. The relation of the plaintiff to the defendant was established by undisputed evidence. The plaintiff, to be sure, was the only witness on the subject, but the conduct of the parties confirms his testimony. The amount of his compensation, that his expenses were to be paid as a part of it, and that he was to receive a pass from each of the companies back of the association were supported by the significant circumstances that this course of dealing prevailed unvaryingly for 19 years. We think as matter of law that he was an employé of the defendant, not in the sense that a brakeman or sectionman or fireman is in its employ in the actual physical work of operating its railroad, but a man recognized by it as in its service and to whom by his contract of employment it was obliged to provide transportation as a part of the agreed compensation to which he was entitled.

[7] The plaintiff on an examination had before a referee previous to the trial testified that there was no agreement that he should be furnished a pass; that his "expenses were to be paid, and I should

have charged my expenses, when I paid them, to the expense account." He testified on the trial that the pass was a part of the consideration of the agreement, and that he did not intend to testify differently before the referee. The variance does not impress me very seriously. The witness had in mind that his expenses were to be paid him. Whether a statement of them was to be rendered to the general agent of the Trunk Line Association and included in the account against the railroad companies, or whether the expense of transportation was to be met with a pass or ticket, was not important to him. The agreement as to the pass was to the advantage of each of the contributing companies. It was less expensive for the defendant to furnish a pass than to pay the plaintiff the expense of traveling over its line. If his expenses were to be paid, he would need a regular ticket, and the defendant would be liable to him, and it ought not to be relieved of liability because it furnished for its own benefit, or in compliance with its contract, other means of transportation, unless some rule of law requires such a holding. The conflict in the testimony of the plaintiff adverted to does not bear upon the question of his employment. It is only material as related to the question whether the pass was a part of his compensation by virtue of the contract. He might be an employé, and yet not be entitled to a free ticket over the defendant's road.

[8-10] The plaintiff at the time he was injured resided, and his business headquarters were, in New York. His wife was then in Warsaw for the summer with her father. The plaintiff shortly before the collision had been in the West in the performance of his duties, and on his return stopped off at Warsaw for a few days. He then went to New York, attending to the duties of his service, and, when injured, was on his way to Warsaw for the purpose of staying two or three days with his family. The claim of the defendant is that he was not on the business of the defendant at the time he was injured, and the court, at the request of the counsel for the defendant, charged the jury that, if they "find that when this plaintiff used this pass he was upon his own business and pleasure, he cannot recover." He also charged, at the request of the same counsel:

"That if the jury find that the plaintiff was a general employé, and also that the pass was not part of the contract of employment, and also that he was not at the time engaged in his duties as such employé of the defendant, but was traveling for his own pleasure and profit, then they must find for the defendant."

The jury must, therefore, have found that the plaintiff was not traveling "for his own pleasure and profit," but was "engaged in his duties" as the employé of the defendant at the time of the collision. The pass contained this limitation on its use:

"Not good for regular or daily travel between residence and place of business."

The plaintiff's trip to Warsaw was not within this restriction, and the defendant elected to embody no other in its pass. Unless there is an apparent or flagrant misuse of the ticket, the defendant should be confined to the limitation which it imposed upon the holder of it.

The trip to Warsaw was not exclusively for "his pleasure and profit." It was in fulfillment of the obligations to his family. It was a time of vacation when men in the city regard a brief stay in the country a necessity in order to relieve the tense strain of business, and to enable them to renew work with greater vigor and efficiency. The inference is permissible that, when in Warsaw, he expected to keep in touch with the conditions of the work in the office in the city. When there before, he responded to a call from New York requiring his attention to business. We think the jury were within the evidence, and the inferences reasonably permissible, in determining this question in favor of the plaintiff.

[11] Dr. Andrews was called as a medical expert on behalf of the plaintiff. He had been present at physical examinations of the plaintiff by two physicians selected by the defendant. The plaintiff's counsel asked him this question:

"From the examination you made and what you learned of this injury and the condition you found him in, are you able to state, with reasonable certainty, as to what was the trouble with him at that time?"

The defendant's counsel objected "upon the ground that in the question he is asked to form his opinion upon something not in evidence." The objection was overruled and exception taken. The witness answered that the plaintiff was suffering from "nervous exhaustion, following concussion of the brain," and that the technical name for that condition is traumatic neurasthenia. The question was improper, in that the witness did not disclose to the jury the facts upon which his opinion was based, and the error was prejudicial, requiring a new trial unless the vice is eliminated by other facts in the record. Matter of Will of Snelling, 136 N. Y. 515, 518, 32 N. E. 1006; Link v. Sheldon et al., 136 N. Y. 1, 7, 32 N. E. 696; McGuire v. Brooklyn Hts. R. R. Co., 30 App. Div. 227, 51 N. Y. Supp. 1025.

[12] Subsequent to the time adverted to by the witness in the above testimony, he made other examinations of the plaintiff and described with considerable detail his condition, and stated that he was suffering from traumatic neurasthenia, which existed in a chronic state at the time of the trial, and this conclusion, which he stated with reasonable certainty, apparently was based on his observation and personal examination of the plaintiff.

Dr. Neefus, another expert, described the condition of the plaintiff and his appearance, discovering "tremor in his hand and in his face," indicating "exhausted nervous condition"; that his face was "markedly flushed," denoting "irritable weakness of the upper part of the spinal cord affecting the nerves. I noticed nothing else in my examination. It is based mostly on what he told me. He told me about this accident." He was asked by the plaintiff's counsel:

"After the examination of him, and in the examination you made after that, are you able to state from what he was suffering at the time? A. I am. "Q. Tell us what ailed him at that time?

"Mr. Matson: I object, that no foundation is made, except information given him by the patient. (Overruled. Exception.)

"What do you say ailed him at that time? (Objected to, upon the same ground, and that his opinion is based upon hearsay. Overruled. Exception.)

A. My conclusion was that he was suffering nervous exhaustion following a period of concussion of the brain as the result of an accident."

He designated this condition as "traumatic neurasthenia." A motion was made by the defendant's counsel to strike out this testimony immediately after its reception and also at the close of the plaintiff's case, suitably assigning the grounds, which motion was denied. This witness was recalled, and testified that he was present at the examination of the plaintiff in October, 1909, which was had at the instance of the defendant by physicians on its behalf. The witness said that at that time he discovered "evidences of the existence of traumatic neurasthenia in him," describing what he observed.

- I think in its final analysis it is a reasonable deduction from the evidence that these physicians based their opinions as to the plaintiff's condition upon their examinations of him, and not upon facts disclosed to them by the plaintiff. Naturally they heard his statement of the manner in which he was injured and the changes in his physical condition since the accident. A careful physician might very properly regard the history of the case in some measure important in aiding in the examination he makes. His final diagnosis, however, would still be based upon what he discovered in the patient.

The physicians on the part of the defendant were not sworn. They had twice made extended physical examinations of him, supplemented by long oral examinations before the referee involving the history of the case from the time of the accident. If there was any controversy over his physical condition or the severity of his injuries, we would expect the disagreement emphasized on the trial by the presence on the witness stand of these medical witnesses. The defendant was apparently satisfied with the opinions given by the medical witnesses testifying for the plaintiff.

The other objections urged do not call for a new trial, and need no independent discussion.

The judgment should be affirmed.

Judgment and order affirmed, with costs. All concur.