**Mildred Gottlieb ROGOW, as Executrix of the Last Will and Testament of Leon Rogow, deceased, also known as Lee Rogow, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

United States District Court
S. D. New York.
May 25, 1959.

548

which he was a passenger, crashed near Mitchel Air Force Base, Long Island, New York. The twin-engined aircraft had left Mitchel Field four minutes before the crash on a flight to Wright-Patterson Air Force Base, Dayton, Ohio. A few moments after take-off the pilot reported that "we got one bad engine here." He stated that he was feathering [1] his right engine and returning to base.

The plane's left engine failed to maintain sufficient power to keep the B-25 aloft and the craft dove into the ground, killing all aboard.[2]

It is plaintiff's contention that her husband's death was caused by the negligence of Air Force personnel in maintaining and/or operating the plane.[3]

Gair & Gair, New York City, by Harry A. Gair, New York City, of counsel, for plaintiff.

Arthur H. Christy, U. S. Atty., for Southern District of New York, New York City, by John A. Guzzetta and Robert L. Tofel, Asst. U. S. Attys., New York City, of counsel, for defendant U. S. A.

IRVING R. KAUFMAN, District Judge.

The plaintiff, Mildred Rogow, widow of Leon Rogow, and executrix of his last will and testament, brought this action pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 et seq., to recover for the wrongful death of her husband. The case was tried to me without a jury.

Mr. Rogow, a free lance writer, was killed instantly when on September 13, 1955, an Air Force B-25 bomber, on

## The Release

The plaintiff is met at the outset with the government's contention that her claim is barred by a release [4] signed by Mr. Rogow just before he embarked on the flight. This document purports to absolve the defendant from liability for its own negligence.

Initially, we must examine Rogow's relationship with the Air Force, and the circumstances which led to his being aboard the aircraft, in order to determine the validity of the release.

At the time of his death, Mr. Rogow was engaged in gathering material for the preparation by him of a script for a documentary Air Force recruiting film dealing with various phases of Air Force training. The plan for such a recruiting film was conceived by the Air Force officers charged with the responsibility for

---

1. Feathering is a process whereby the propeller blades of an engine are turned so that their edges face into the slip stream thereby presenting the minimum possible drag. This is done when the pilot wishes to shut off an engine. (Tr. 181.)

2. Defendant's answer to plaintiff's interrogatory No. 29 states that "the aircraft struck the ground in a nose-down position after stalling at approximately 300 feet." (Tr. 570.)

3. It is not disputed that the aircraft was owned by the defendant and was operated and maintained by defendant's personnel acting within the scope of their employment.

4. Although this document is probably better denominated a covenant not to sue, the release terminology was used by the parties throughout the trial and will be used here for clarity and consistency. The terminology will not affect the result.

recruiting. (Tr. 56.) In accordance with its usual procedures in the production of such a film, the Air Force's need was communicated to the advertising agency of Ruthrauff & Ryan, who were the prime contractors for projects of this kind. The agency, in turn, obtained the services of Mr. Rogow, as script writer, through United World Films, Inc., a firm specializing in commercial film production. (Tr. 110.) Discussions were then held between Rogow and Air Force officers concerning the most effective method of carrying out the project. It was decided that in order for him to properly prepare the script, it was essential for Rogow to visit various Air Force training centers to obtain familiarity with and an understanding of the subject matter of the proposed film (Tr. 20.) At the suggestion of the Air Force, it was agreed that most of these trips from base to base would be made by military aircraft.[5] Also at the suggestion of the Air Force, the first stop on Mr. Rogow's itinerary was to have been Wright-Patterson Air Force Base, where he was to have conferred with the officers responsible for the Air Forces' recruiting program. (Tr. 22, 40.) From Dayton he was to proceed to other bases by military aircraft. The original schedule called for Mr. Rogow to leave for Dayton on September 12th by commercial airline. Pursuant to the arrangement among the defendant, the prime contractor and the decedent, the defendant would have reimbursed him for his travel charges.

At the suggestion of Lt. Col. Coenen, an executive officer of the Air Force, these plans for commercial air travel were changed and Mr. Rogow instead embarked on the illfated Air Force flight. (Tr. 26, 42 et seq.)[6] The change involved no monetary saving for decedent since the government was already obligated to reimburse him through its prime contractor for his travel charges. (Tr. 37–38.)

At his last meeting with the Air Force officers before the flight, Mr. Rogow was informed that he would be required to sign a release. The release was actually presented to Rogow and signed by him shortly before embarkation. This document purports to release the defendant, its officers and employees from any liability for death or injury resulting from the flight.[7]

5. The transportation authorization (Defendant's Exhibit V) issued for Mr. Rogow's trip shows that the fatal flight was treated as one of a series of flights in military aircraft made for the benefit of the military service.

"1. You are authorized to travel on or about 12 September 1955 by military aircraft from Mitchel Air Force Base, New York to Wright-Patterson Air Force Base, Ohio; Scott Air Force Base, Illinois and Chanute Air Force Base, Illinois and such local flights in the vicinity of each base as might be necessary to accomplish research for a Recruiting Documentary Film script, and return to Mitchel Air Force Base, New York on or about 1 October 1955.

"2. Travel is necessary in the military service and is authorized under provisions of Air Force Regulations 76–6 or 76–15, as applicable, at no expense to United States Government. Non-revenue traffic.

"By Order of the Secretary of the Air Force."

6. The fact that this suggestion originated with the defendant is clearly shown by Colonel Coenen's deposition which was read into the record. He testified as follows:

"Q. (By Mr. Goetell, attorney for defendant). At any time did Mr. Rogow request that you furnish an Air Force plane for him? A. No, he never requested.

"Q. This is to Dayton?

\* \* \* \* \*

"A. Yes, Dayton. No, he never requested it in writing or asked that he got [Sic] by military. In fact, it was assumed that he would go commercial up to that point.

"Q. This suggestion came from the United States Air Force that he go by military aircraft? A. Yes, we offered it to him, and he agreed. I offered it myself, I said, It looks like we can get a B-25 if you want to go by military aircraft." (Tr. 43.)

7. "Release
Mitchel A F Base
(Place)
13 Sept. 55
(Date)

"Know All Men By These Presents: Whereby, I, Lee Rogow am about to take a flight or flights as a passenger

## The Validity of the Release

The government's contention that this release bars any recovery was considered by another judge of this court on defendant's motion for summary judgment. At that time, the plaintiff urged that the release was unenforceable because it was against the public policy of New York State. Plaintiff urged that the New York courts had consistently refused to give effect to releases of this kind where the injured plaintiff had not received a gratuitous benefit from the defendant, such as a free pass. Defendant has stated (p. 29 Defendant's Trial Memo) that this motion was denied in an oral decision "on the ground that on the release matter a question of fact existed with respect to the 'gratuitous' nature of the services provided decedent by the Air Force in making available to him a military flight * * *."

The defendant contends that the services provided by the Air Force were gratuitous. Defendant also vigorously disputes the correctness of the ruling that the gratuitous nature of the ride is crucial to the validity of the release. It is defendant's position that the release is valid regardless of whether or not the flight was a gratuitous benefit conferred by the Air Force. An examination of the New York authorities applicable to this area of the law demonstrates that defendant is in error. It is true that releases have been upheld where the defendant had conferred a gratuitous benefit on the plaintiff either in the form of a

free pass or a reduced fare ticket. See e.g. Anderson v. Erie Railroad Co., 1918, 223 N.Y. 277, 119 N.E. 557; Montalbano v. New York Cent. Railroad Co., 4th Dept.1944, 267 App.Div. 617, 47 N.Y.S.2d 877. But the courts have emphasized that a crucial question in such cases is whether or not the transportation was provided gratuitously. The release here involved is clearly against the public policy of New York unless the plane ride can be characterized as a gift from the Air Force to Mr. Rogow.

Agreements purporting to release a party from liability are not favored by the New York courts. In Johnson v. Fargo, 4th Dept.1904, 98 App.Div. 436, 90 N.Y.S. 725, at page 730, affirmed 1906, 184 N.Y. 379, 77 N.E. 388, 7 L.R.A.,N.S., 537, such a release was found to be against public policy, the Court stating:

> "The general principle that contracts breaking down common-law liability and relieving persons from just penalties for their negligent and improper conduct are not to be favored. * * *" Cf. Boll v. Sharp & Dohme, Inc., 1st Dept.1953, 281 App.Div. 568, 121 N.Y.S.2d 20, affirmed 1954, 307 N.Y. 646, 120 N.E. 2d 836; Kearns v. City of Buffalo, 1952, 202 Misc. 619, 111 N.Y.S.2d 778, 781.

The rationale behind the numerous decisions invalidating releases of the kind involved here is based upon the policy of encouraging the exercise of care. The

in certain Army, Navy and/or Air Force aircraft on 13 Sept. 55; and whereas I am doing so entirely upon my own initiative, risk and responsibility; now, therefore, in consideration of the permission extended to me by the United States, through its officers and agents to take said flight or flights, I do hereby, for myself, my heirs, executors and administrators, remise, release and forever discharge the Government of the United States and all its officers, agents, and employees, acting officially or otherwise, from any and all claims, demands, actions, or causes of action, on account of my death or on account of any injury to me or my property which may occur from any cause during said flight or flights

or continuances thereof, as well as all ground and flight operations incident thereto.

"L. Rogow
(signature)

"R. E. Hall, Capt.
(Witness)
Harold E. Chapman
(Witness)

Mildred Rogow
(Name of person

to be notified in emergency)
Ocean Beach, N. Y.
(Address of person to be notified in emergency)"

(Defendant's Exhibit W).

courts seek, also, to protect individuals from the effects of agreements which are rarely considered by the signer with the thoughtfulness and care appropriate to the catastrophic consequences which may result to him and his family. Where the plaintiff has either paid full fare for his passage or where a pass has been issued as part of a contract of employment, releases have not been upheld. Thus, in Montalbano, supra, 47 N.Y.S.2d at page 880, the court said:

"If the pass issued to him was part of his contract of employment, and not a mere gratuity, the defendant could not relieve itself from negligence by so providing in the pass. Section 64, Article 3, Railroad Law. If his pass was a mere gratuity, the reverse would be true."

Similarly in Kroehling v. City of New York, 2d Dept.1946, 270 App.Div. 909, 61 N.Y.S.2d 474, at page 475, it was said:

"Upon the trial defendant conceded that the accident was due to its negligence but claimed immunity from liability by virtue of the provisions of the pass. The Trial Court submitted to the jury, as a question of fact, whether the pass was received by the plaintiff as a mere gratuity or as a part of his contract of employment. The jury found in favor of the plaintiff * * *. The case was properly submitted to the jury * * *."

Again in Anderson v. Erie Railroad Co. supra, it was stated by the court:

"It is not necessary to the validity and effectiveness of the contract of release that the passenger be carried free of all charge, but it is sufficient that a valid reduction of fare satisfactory to the passenger be agreed upon." 3rd Dept.1916, 171 App.Div. 687, 157 N.Y.S. 740, at page 744, affirmed 1918, 223 N.Y. 277, 119 N.E. 557.

In Vroom v. New York Cent. & H. R. R. Co., 4th Dept.1909, 129 App.Div. 858, 115 N.Y.S. 1063, 1065, affirmed 1910, 197 N.Y. 588, 91 N.E. 1121, the release was found to be unenforceable, the court saying:

"But, even if that relation did not exist at the time of the accident, we think under the circumstances of this case it could well be found that the pass was not a mere gratuity, but a part of the contract of employment, entitling the deceased to transportation to and from his work."

Conklin v. Canadian-Colonial Airways, Inc., 1935, 266 N.Y. 244, 248, 194 N.E. 692, 693, is even closer in point. There the plaintiff's decedent had been killed in the crash of an airliner. The defendant attempted to assert the validity of a release citing such cases as Anderson v. Erie R. Co. supra. The Court of Appeals distinguished these cases by saying:

"The decisions in this state relied on by the appellant * * * either involved free passage or else contracts to exempt the carrier from liability for negligence in consideration of a reduced fare."[8]

The facts in Gill v. Erie Railroad Co., 4th Dept.1912, 151 App.Div. 131, 135 N.Y.S. 355, were strikingly similar to those of the instant case. There the plaintiff was the employee of an independent association and like Mr. Rogow was traveling on the business of the defendant. There, as here, the defendant was obligated by contract to pay plaintiff's transportation charges and had satisfied this obligation by permitting plaintiff to travel free on defendant's conveyance. The Court held that a release under such circumstances was unenforceable. Gill illustrates that it is

8. The Court pointed out that in the cases cited by defendant the passenger had always had the voluntary choice of full fare or limited liability. In the case at bar Mr. Rogow had no such choice. If, as defendant argues, the flight was of benefit to Rogow as well as to the Air Force, Rogow could not have obtained these benefits by the payment of "full fare".

not the technical status of "employee" that is decisive but rather the actual relationship of the parties and the non-gratuitous nature of the transportation involved.[9] It is true that Rogow was not technically an "employee" of the Air Force. The defendant urges that if it is found that Rogow was engaged in business in behalf of the Air Force then he would take on the status of an "employee" and thus be foreclosed from proceeding under the Federal Torts Claim Act. This is a non sequitur, for while it is clear that Rogow was not an "employee" of the Air Force, he was working in its behalf.

I, therefore, concur with the reason for Judge Walsh's denial of the motion for summary judgment. The release can stand only if the plane trip was a gratuitous benefit to Mr. Rogow. On the basis of the testimony bearing on the circumstances leading to the signing of the release, it is quite clear to me that the flight was not provided gratuitously. The only purpose for the trip was the gathering of material for the preparation of a script for the Air Force film. Rogow changed plans for commercial air travel and accepted the suggestion of the Air Force that he fly on its craft. He discommoded himself to suit the convenience of the Air Force. As a result of defendant's suggestion Rogow subjected himself to the dangers and discomforts of military flying to further a project of considerable interest to the Air Force. It is realistic to believe that one of the reasons for the suggestion by the Air Force that decedent travel by bomber was to provide him with an opportunity at the earliest possible moment to observe Air Force personnel in action and to thus give him a "feel" for the subject matter about which he was to write. In short, the main benefits resulting from the flight were those flowing to the Air Force. Rogow benefited only incidentally. As a writer of considerable repute, he had an interest in producing the best possible script. But, in the main, there can be little doubt that the principal beneficiary of Rogow's military travel was the Air Force, because the trip would enable Rogow to give them a more meaningful script at an earlier date. It can hardly be said that an individual (1) traveling in furtherance of an Air Force project; (2) in a manner suggested by the Air Force and (3) whom the Air Force is in any event obligated to reimburse for his travel costs, is nevertheless the recipient of Air Force largess in the form of a "free ride."[10] I, therefore, conclude that the flight was not a gratuitous benefit to Rogow.

The defendant has attempted to distinguish some of the cases invalidating releases on the ground that they involve common carriers. The decisions of the New York courts in this area are founded on broad public policy considerations. I do not believe that the courts would deprive these precedents of much of their force by limiting their applicability in the manner urged by the defendant. Releases of the kind involved here are unen-

9. See Olsen v. Draper, D.C.E.D.N.Y.1953, 112 F.Supp. 859, where the Court pointed out that "here the plaintiff's intestate was not an employee of the defendant's railroad. On the other hand, his status cannot be equated to that of the ordinary passenger who is transported by the defendant's railroad by virtue of his having paid the regular fare." 112 F.Supp. at page 861. Nevertheless it was assumed that the validity of the release depended upon whether the pass used by the defendant was a "mere gratuity". See also Kearns v. City of Buffalo, supra.

10. Certainly, it was in the Air Force's interest for Rogow to absorb as much knowledge about that branch of the service as feasible, so that he could write the best possible script picturing the Air Force in such favorable light that enlistments would be encouraged. At the moment he embarked on the flight, Rogow was engaged in aiding the Air Force in its project for a documentary film. Obviously he was not just a free rider. Rogow was recognized by the Air Force to be in its service and it desired to furnish this transportation to him. (See Transportation Authorization, Defendant's Exhibit V, footnote 5, supra.)

forceable in New York where the defendant has not conferred a gratuitous benefit on the plaintiff.

Furthermore, in attempting to distinguish the common carrier cases, defendant loses sight of their most important factor. What was significant was not the defendant's technical status as a common carrier. Rather, the key to those cases lies in the fact that, once having placed himself in defendant's hands, the plaintiff was no longer able to take any steps to provide for his own safety.

The reasoning underlying cases involving railways, and such instrumentalities as elevators (see Johnson v. Fargo, supra) is especially apt here. From the moment the decedent stepped aboard the defendant's aircraft his survival depended upon the skill of defendant's pilots and maintenance personnel. As a layman, he could hardly inspect the aircraft himself or even detect the most blatant operational negligence. Thus, this case must be distinguished from those instances where the signer of the release is in a position to protect himself through the exercise of care. Cf. Mercante v. Hygrade Food Products Corp., 2d Dept.1940, 258 App.Div. 641, 17 N.Y.S.2d 625. As the court said in the Fargo case, supra, 90 N.Y.S. at page 728:

> "It requires no extended discussion to show that as a matter of public policy there is a wide difference between allowing an employé to assume risks which are obvious, known, and appreciated, and allowing an employer to exempt himself

from those which are latent, unknown, and not understood."

In this case the release did not purport merely to shift the duty to use care or to inspect. If the duties did not rest upon the defendant they rested nowhere.

Defendant has not cited a single case sustaining the validity of a release where the injury was caused by negligence from which the plaintiff could not protect himself and where the plaintiff was engaged in business in behalf of the defendant at the time of the accident.

■ In light of the foregoing, I conclude that the release signed by Leon Rogow on September 13, 1955, is unenforceable. The plaintiff may recover if she has demonstrated that her husband's death resulted from defendant's negligence. We next proceed to a discussion of this aspect of the case.

### Liability

#### The Accident

The stark outlines of the tragedy may be briefly sketched. The B–25 with Mr. Rogow aboard took off from Mitchel Air Force Base at 7:30 A.M. September 13, 1955. The take-off itself was accomplished without incident. When the plane was about 2 miles from the Field, and about 1,000 feet airborne, the Mitchel control tower received a series of radio communications from the pilot relative to the condition of the plane. These communications are set out below.[11] The pilot reported that he had "one bad engine"; that it looked as if he had a "stack blown" and that he was losing some oil. He then reported that he was feathering his right engine and returning to the Base. The last communica-

11. "From B 25 to Mitchel Tower: We are returning into the pattern—we got one bad engine here.

"Tower: How bad are your difficulties?

"B 25: Looks like we have a stack blown. We are losing a little bit of oil.

"Tower: Are you going to declare an emergency?

"B 25: We are going to have to feather this engine.

"Tower: Request amount of fuel and number of people on board.

"B 25: We have got a full load of fuel and six people on board.

"Tower: Full load and six people. 822 request which engine, right or left."

"B 25: Right engine, tower, right engine.

"Tower: Check the base, you are number 1.

"Tower: 822, are you coming in on Runway 5?

"B 25: High pitched scream sounding like 'We are going to hit' (Interrogatory 48 b)." (Tr. 5–6.)

tion from the plane was received at 7:34, only four minutes after take-off. This call consisted of a high-pitched scream sounding like "We are going to hit". (Tr. 6.)

At 7:34 the B–25 dove into the ground 2 miles south of Mitchel Field's nearest runway. The forward part of the aircraft was completely demolished and all aboard died instantly.

Air Force personnel were on the scene within a few minutes of the crash. They found the cockpit so badly damaged that it was impossible to determine what the control settings had been before the accident. (Tr. 184, 570.) However, they were able to determine that the right engine had been shut down and feathered at the time of impact. The left engine had been producing some power up to the time its propeller blades struck the ground. Both engines had been damaged by impact. They were removed and shipped to the Aerodex Company, an independent corporation, where they were dismantled and examined for any evidence of malfunction. Aerodex reported that certain of the cylinders on both engines showed evidences of having been subjected to extreme heat and that signs of leakage between the cylinder barrels and heads were also evident.[12]

About a month after the crash, an Aircraft Accident Investigating Board was convened by the Air Force to determine the cause of the accident. (Tr. 202.) The report of that Board was not introduced in evidence and is not available.[13] However, two members of the Board testified at the trial that they personally had concluded that they were unable to determine the cause of the accident.[14]

Plaintiff's contention is that when a two-engine aircraft with excellent single engine characteristics[15] departs on a routine flight and within a few minutes reports that the pilot must shut down one engine due to malfunction and the second engine is unable to maintain sufficient power to keep the plane aloft it must be inferred that the crash was caused by negligent maintenance or operation. In sum, the plaintiff rested her case primarily on the doctrine of res ipsa loquitur.

*Res Ipsa Loquitur*

The Court of Appeals for the Second Circuit succinctly stated the elements of this doctrine in Citrola v. Eastern Air Lines, Inc., 2 Cir., 264 F.2d 815, 817. There it was said: .

"Under the New York law the doctrine of *res ipsa loquitur* essentially means that, 'where the instrumentality which produced an injury is within the exclusive possession and control of the person charged with negligence, and such person has exclusive knowledge of the care exercised in the control and management of that instrumentality, evi-

---

12. The report in regard to one engine stated, inter alia, "(1) Six cylinders appeared to have been leaking between the head and barrel and also showed signs of extreme heat." The report in regard to the other engine stated similar findings as to five cylinders. (Defendant's Exhibit E.)

13. It is Air Force policy to withhold such reports on the grounds that their revelation would discourage frank testimony by interested parties, such as aircraft manufacturers, at future investigations. Candid testimony at these investigations in apparently essential to the Air Force safety program. In this case it was urged that no prejudice to plaintiff result-

ed from the non-production of the reports since all of the witnesses and documents available to the Board were made available to the plaintiff.

14. Major Geyer, who served as president of the Board (Tr. 210), and Capt. Barrett, who was its "maintenance member". (Tr. 368.)

15. Flight Handbook, USAF Series TB–25N Aircraft p. 55. (Plaintiff's Exhibit 11.)' The single engine flight characteristics of the airplane are excellent. The airplane can be flown or landed safely on one engine if the pilots understand single-engine flight principles and fully master the single engine procedures.

dence of circumstances which showed the accident would not ordinarily have occurred without neglect of some duty owed to the plaintiff is sufficient to justify an inference of negligence and to shift the burden of explanation to the defendant.'" (Citing New York authority.)

Here the defendant had exclusive possession and control of the aircraft and exclusive knowledge of the care exercised in its control and management. This is conceded. I must, therefore, determine whether this is the type of accident which does not normally happen without negligence and if so, whether the defendant's explanation of the catastrophe is satisfactory.

*The Inference of Negligence*

■ The plane involved in this case was not of new or experimental design. It was not a jet [16] but a tried and long-used conventional aircraft. The record shows that the particular plane here involved was delivered to the Government in 1945 (Tr. 114). It is common knowledge that the B–25 type bomber (of Doolittle raid fame) was operational for several years before that. Nor are we dealing with a situation where the vagaries of weather could have produced a crash beyond the control of any human agency. The weather was clear and all agree that it played no part in the tragedy.

In the early days of aviation, perhaps, it could have been said that planes crashed frequently and mysteriously through no fault of pilot or maintenance personnel. Cf. Rochester Gas & Electric Corp. v. Dunlop, 1933, 148 Misc. 849, 266 N.Y.S. 469. But great technical progress in the last few years has brought the art of flying to the state where aircraft do not generally meet disaster in the absence of some negligence. The New York courts have recognized this fact by applying the res ipsa loquitur doctrine in airplane crash cases. See Seaman v. Curtiss, Flying Service, 2d Dept.1930, 231 App.Div. 867, 247 N.Y.S. 251; Sollak v. State of New York, N.Y.Ct.Cl.1927, 1929 U.S.Aviation Rep. 42. The Federal courts applying New York law have also repeatedly upheld the doctrine. See Lobel v. American Airlines, Inc., 2 Cir., 1951, 192 F.2d 217, certiorari denied 1952, 342 U.S. 945, 72 S.Ct. 558, 96 L.Ed. 703; O'Connor v. United States, 2 Cir., 1958, 251 F.2d 939; Citrola v. Eastern Air Lines, Inc., supra.[17]

■ In this case the inference of negligence is certainly as compelling as in the cases just cited. In Lobel, for example, plaintiff was injured when two engines of the plane on which he was traveling "stopped functioning". In O'Connor, decedent's death was caused by the head-on collision of a B–36 bomber and a F–51 fighter which were engaged in tactical exercises. The planes had intended to pass within 500 ft. of each other. In Citrola, the case was submitted to the jury on two theories: (1) res ipsa loquitur, and (2) specific acts of negligence, i.e. flying below the minimum safe altitude. In upholding the district court judge's charge, the court pointed

16. As was the case in Williams v. United States, 5 Cir., 1955, 218 F.2d 473.

17. In a case cited with approval by the Second Circuit in O'Connor v. United States, supra, the Tenth Circuit said: "In the past decade tremendous improvements have been effected in the design and construction of airplanes, and in the operation and maintenance thereof. Today, an airplane operated under normal weather conditions is a reasonably safe means of transportation. On the basis of passenger miles flown it is relatively as safe as other methods of public transportation. * * * An airplane of a proven safe type of design taking off for an ordinary routine flight under normal weather conditions does not crash in the ordinary course of things, unless there has been a failure to properly inspect, service and maintain it, or unless it is not operated with due care." United States v. Kesinger, 10 Cir., 1951, 190 F.2d 529, 531. In that case res ipsa loquitur was applied where an Air Force bomber inexplicably struck the ground shortly after take-off.

out that low flying was far from the only probable cause of the accident. In all of these cases, as in the case at bar, the accident *could* have been due to various causes which the plaintiffs could not possibly have specified or negated. Government counsel has suggested, for example, that a plane may crash because the pilot has died at the controls. (Tr. 159.) Indeed, the O'Connor crash might have been caused by a broken control cable; the Kesinger crash by a down-draft and the Lobel disaster by defective fuel. However, the cases teach that plaintiff need not negate every other possible cause for a crash. She must only show that such an accident does not usually occur without negligent maintenance or operation. This she has done.

### The Government's Explanation

The Government has attempted an exculpatory explanation of the accident. It was defendant's contention at the trial that the plane would have been capable of returning to base on its left engine,[18] under ordinary circumstances, but that the oil line or the governor controlling the pitch of the propeller had somehow failed, throwing the propeller into low pitch and thereby preventing the engine from developing sufficient power.[19] (Tr. 547 et seq.)

It was admitted that this theory was not evolved until three weeks before the trial, more than three years after the accident. (Tr. 567.) It was conceived by an Air Force officer, who although he is a highly experienced maintenance officer, had no direct contact with the plane involved and did not have access to the material available to the Board. This ingenious theory is founded upon two facts: First, about a pint to two quarts of oil was discovered on the bomber's left vertical stabilizer. (Tr. 309.)

It is argued that this oil was thrown from the engine when the oil line broke. Secondly, a resident of the Mitchel Field area, Mr. Ryan, testified that he heard the plane shortly before the crash and that the engine sounded as if it was "racing". (Tr. 518 et seq.) It must be remembered that it is normal procedure to operate an engine at low pitch and high R.P.M. when flying on one engine. (Tr. 652.) Furthermore, while Mr. Ryan testified to the unusual sound, it must be noted that there is no evidence as to what is the usual sound for one engine operation of a two engine plane, a condition that must have been indeed rare in the Mitchel Field vicinity. Thus, the "racing" sound may have indicated nothing out of the ordinary for single engine operation of a two engine plane. It is also conceivable that mishandling by the pilot in following the single engine procedure could have resulted in unusual engine sounds. Certainly a theory grounded on such weak foundations cannot be said to satisfactorily explain away the accident. It is considerably less plausible than the explanation that the defendant's negligence caused the left engine to develop insufficient power. Furthermore, the evidence shows that this theory could have been verified by the Air Force. If, during the post-crash investigation, the government had examined the mechanism of the left propeller hub, it could have ascertained with certainty the pitch of the blades at the moment of impact. No such examination was made. (Tr. 309 et seq.)

But, defendant's explanation fails for an even more compelling reason. It nowhere accounts for the failure of the right engine. (Tr. 581.) It is axiomatic that two engine aircraft are intended to fly on both engines. The section of the

---

18. It is agreed that the B–25 had excellent single-engine flight characteristics. (See footnote 15.)

19. The pitch or angle of propeller blades can be regulated by the pilot to cause the propeller to take a large or small bite out of the air. When the propeller is in low or fine pitch (used on take-off) the propeller cuts into the air at a small angle and hence the engine operates at a high rate of speed.

B–25 flight handbook (Plaintiff's Exhibit 11) dealing with single engine procedure is boldly edged in red and labeled "Emergency Procedures". An aircraft limping home on one engine within a few hundred feet of the ground is hardly a safe conveyance. If defendant's negligence deprived the B–25 of half its power, it placed aircraft and passengers in a position where a slight mishap would lead to disaster. This alone would justify a finding for the plaintiff. If we assume that the pilot was correct in believing that he had a "blown exhaust stack" the defendant must explain this mechanical failure. If the pilot was incorrect the Government must offer satisfactory explanation for the failure or the stopping of the engine. There is some testimony that a small amount of leaking oil could cause black smoke to pour from the engine and that in such circumstances a prudent pilot would be unable to determine the exact cause of the smoke and would shut down that motor to prevent fire. (Tr. 373.) If leaking oil can have such dangerous consequences it should be prevented. It is, therefore, clear that the Government has not satisfactorily explained the reason for the crash. In short, the accident involved here is one that would not normally happen in the absence of negligent maintenance and/or operation. Since it was defendant's officers and employees who flew and maintained the plane, I can only infer that the crash was due to the negligence of the defendant.

*Plaintiff's Alternative Theory*

I will treat only briefly the theory advanced by the plaintiff to explain the crash and which was relied upon as an alternate ground for recovery. It was plaintiff's contention based upon information elicited on cross-examination and upon testimony of plaintiff's expert witness that the Aerodex report indicates that there was sufficient leaking of compression between the cylinder barrels and the cylinder heads to prevent the engine from developing sufficient power.[20] The evidence shows that an overheating of the engine could cause detonation or preignition within the cylinder. This, in turn, would raise the temperature still further to the point where an expansion of the metal would permit combustion gases to escape, resulting in loss of compression. (Tr. 290, 291.) Such leakage would cause the engine to smoke (deceiving the pilot into believing he had a blown exhaust stack) and might also reduce the available power to the point where the plane could no longer remain in the air. There is evidence that such overheating and loss of compression could be attributed to improper maintenance of the engine and/or the use of poor technique by the pilot (E.g. Tr. 303).[21] This is a convincing explanation and a more plausible one than that advanced by the Air Force.

On the basis of all of the evidence I find that the accident and Mr.

---

20. The deposition of Henry O. Holland, an Aerodex inspector, confirmed that many of the cylinders showed signs of leakage between barrel and head. The leakage was evidenced by "a black substance and black oil between the barrel and the head." (Tr. 524.)

The significance of such oil and carbon was clearly pointed out by the testimony of Capt. Barrett, maintenance control officer at Mitchel Air Force Base. On cross-examination he stated:

" * * * [I]t was carbon and oil that had seeped out between the barrel and the cylinder head, would heat and turn to carbon, and that would be evidence of oil leaking between the cylinder and the head." (Tr. 384.)

21. This theory finds considerable support in defendant's answer to plaintiff's interrogatory No. 29. In answer to the question: "Set forth a detailed description of the cause or probable cause so determined", defendant replied, inter alia, "Tests conducted on left engine indicated that at high cylinder head temperature (usually attained during ground operation, take-off and climb when engine is putting out near maximum power) there was evidence of eight cylinders leaking compression in the left engine, which could have caused sufficient loss of power to preclude single engine flight." (Tr. 570–71.)

Rogow's death were caused by the negligence of the defendant in operating and/or maintaining the aircraft.

## Damages

I come now to the question of damages. The amount recoverable in an action for wrongful death in New York is governed by section 132 of the New York Decedent Estate Law, McKinney's Consol.Laws, c. 13. That section provides:

"The damages awarded to the plaintiff may be such a sum as * * * the court * * * deems to be a fair and just compensation for the pecuniary injuries, resulting from the decedent's death, to the person or persons, for whose benefit the action is brought. * * * ".

What constitutes "fair and just compensation" depends upon all of the facts in any given case.

"The main elements to be considered are the age of the decedent, his health, habits, qualities, expectation of life and expectation in life, earning ability, income, the prospect of increase of income, the number, age, sex, situation, and condition of those dependent on him for support, and his disposition to support them well or otherwise, and the like * * * [T]he precise question is: What were the probable chances of pecuniary benefit from the continuance in life of the decedent worth under all circumstances?" Arnold v. State, 3rd Dept.1914, 163 App.Div. 253, 148 N.Y.S. 479, 486.

At the time of his death Leon Rogow was 36 years of age. He was survived by his wife, Mildred, also 36, whom he had married in 1947, and two children: a daughter Margaret, aged 5, and a son Zachary, aged 3.

It has been stipulated that the joint life expectancy of Leon and Mildred Rogow is 30 years.

Since approximately 1947 Leon Rogow had earned his living as a free lance writer. He had been quite successful at his profession. Mr. James Franey, president of United World Films, Inc., testified that since 1947 Rogow had written for United World some 200 or more scripts for television and commercial production (Tr. 108) and that Rogow was, in his language, "tops". (Tr. 113.) In addition to his work for United World, Rogow wrote articles or short stories appearing in the New Yorker, Harper's Magazine, Collier's, Women's Home Companion, Ladies Home Journal, Liberty Magazine, Redbook, Cosmopolitan, Esquire and This Week Magazine. At the time of his death Rogow also served as copy chief for the advertising agency, Cole, Fisher and Rogow. These are some of his accomplishments. His income tax returns for the years 1951 through the first nine months of 1955 were admitted in evidence, and they indicate that in those years he earned $22,527, $27,125, $22,468, $23,623 and $15,479 respectively.

I must determine what portion of his income decedent had contributed to his family prior to his death in order to estimate what his contributions would have been in the future had he lived. According to the testimony of his wife, Rogow was a devoted family man. Mrs. Rogow estimated that in 1954, the last full year before his death, Rogow contributed about $16,000 to his family. However, Rogow's income tax return for that year indicates that this figure is excessive. Since Mrs. Rogow's testimony on this issue was concededly only an approximation, I will accept Rogow's income tax returns as the best basis for determining his past contributions to his family.

According to his 1954 income tax return, Rogow's total income for that year was $23,623.[1] The return shows that he spent $6,679.73 for business expenses.

---

[1] 1954 is selected because it was the last full year before Rogow's death, and is used also as a good "average" year of the five preceding his death.

His adjusted gross income before taxes was $17,008.76.[2] Rogow paid $3,202.62 in income tax in 1954, leaving $13,806.-14 net income after taxes. Obviously not all of this money represents contribution to his family. Some deduction must be made for Leon Rogow's personal expenditures and some of the family's expenditures must be attributed to Leon. There is no evidence in the case concerning Rogow's personal expenditures, save Mrs. Rogow's testimony that her husband was "frugal about clothing". (Tr. 137.) However, I think it reasonable to attribute $3,000 to Leon personally, leaving approximately $10,800 for contribution to the family.

It was stipulated at the trial that if Mr. Sharp of the firm of Woodward, Ryan, Sharp and Davis, consulting actuaries, were called to the stand he would testify that the sum required to yield $1,000 of income for the joint life expectancy of the decedent and his wife, so that at the end no corpus will remain, is $18,713.91. This is based on a 3½ per cent interest rate. (Tr. 631.) Defendant does not contest the validity of this figure, and I will accept it in computing the present worth of plaintiff's lost expectancy. I find, therefore, that the reasonable value of the lost contribution from Leon Rogow to his family is $202,110.

Plaintiff has urged that allowance should be made for the likelihood that Leon Rogow would have increased his earnings in the future had he lived. In support of her position plaintiff points to the fact that Rogow was receiving about $2,000 per story at the time of his death, whereas in his early years as a free lance writer he had received approximately $150 per story. (Tr. 82); that he was described by Mr. Franey of United World Films as "tops" (Tr. 113) and by one of the Air Force officers with whom he consulted concerning the assignment he was working on at the time of the fatal crash as "brilliant" (deposition of Lt. Colonel Coenen, Tr. 24); that after his death an outline and the first 5,000 words of a novel on which he had been working was sold for a motion picture to Twentieth Century Fox for $15,000. (Tr. 88.) Plaintiff has introduced other evidence indicating that Mr. Rogow's abilities as a writer were well regarded. From this she argues that I may reasonably infer that a man of Rogow's capabilities had not reached the peak of his earning capacities at the age of 36.

The defendant, on the other hand, urges that the fact that Rogow's income had been fairly stable over the past five years indicates that he had reached the approximate summit of his prospects.

It is true that increases in future earnings are to be considered in arriving at the probable contributions to the family of the deceased. Briscoe v. United States, 2 Cir., 1938, 65 F.2d 404. But such an award must be a "just and reasonable estimate * * * based on relevant data." It cannot be "based on speculation or guesswork." DeVito v. United Air Lines, D.C.E.D.N.Y.1951, 98 F. Supp. 88, 99; O'Connor v. United States, 2 Cir., 1958, 251 F.2d 939.

"Pecuniary loss is the destruction of a reasonable expectation of pecuniary advantage from the deceased. It is not a matter of guess

---

2. This figure includes $65 interest on a savings account. It also includes $3,900 in "salary" that Leon Rogow purportedly paid to his wife. However, it is clear that this was a salary in form only, being in actuality part of Rogow's contribution to his wife and family. Mildred Rogow testified that this money was not paid to her on any regular basis (Tr. 138–139) and that when she received it she would deposit it in the joint account maintained by her husband and herself from which both she and Leon drew. (Tr. 99.) At times Mr. Rogow would not pay her the money at all, "he would just say that I had that much credit with him, if I wanted to buy something I could get it." (Tr. 139.) Thus it is clear that the money listed as salary to Mildred Rogow in reality occupied no different position from other moneys contributed by Leon Rogow to his family.

or conjecture, but must be based upon facts showing the contributions which the deceased made during his lifetime and facts upon which the jury can base an estimate of the probable contributions which he would have made for the balance of his natural life." Cromley v. Speich, D.C.M.D.Pa.1937, 19 F.Supp. 857, 858, affirmed, 3 Cir., 1938, 94 F.2d 543.

In the instant case, it is at least as reasonable to conclude that decedent's income would have remained fairly stable as that it would have increased. That he was "tops" and "brilliant" accounts for the fact that he had achieved a marked degree of success in a difficult and extremely competitive field, and that his income at the time of his death was substantially greater than when he had started out in his profession. He had succeeded in a field occupied by many brilliant men. His income had leveled off in the years preceding his death and I am offered no evidence upon which to approximate a reasonable estimate of increases to earnings. Indeed, in view of the hazards and uncertainties of the writing profession, were I to venture into the realm of speculation, I could speculate that his income might diminish as well as experience a rise. To be sure, this is not an area in which findings are susceptible of mathematical certainty, but I am not at liberty to fictionalize Rogow's future. I find that there is no adequate evidence upon which to base a finding of future increased earnings.

In addition to the lost contribution, plaintiff also seeks to recover, on behalf of the two children, for the loss of parental care and guidance. The loss of the care and guidance and advice of a father is a pecuniary injury to his children during their minority.

"The deprivation [of intellectual, moral and physical training] is such as to admit of definite valuation, if there be evidence of the fitness of the parent, and that the child has been actually deprived of such advantages." Michigan Central R. Co. v. Vreeland, 1913, 227 U.S. 59, 73, 33 S.Ct. 192, 197, 57 L.Ed. 417.

The defendant concedes that minor chidren may recover for the loss of parental care and guidance, but it lays stress on the fact that such loss must be "of a pecuniary nature". While the defendant does not deny that Rogow was a loving or devoted father, it takes the position that the loss sustained by the children in the instant case was one of love and affection only.

This argument loses sight of the true meaning of the word "pecuniary" in the New York wrongful death statute. The New York Court of Appeals has stated that the intellectual, moral and physical training which a parent gives to a child

"is, to say the least, as essential to their future well-being in a wordly point of view, and to their success in life, as the instruction in letters and other branches of elementary education which they receive at the hands of other teachers who are employed for a pecuniary compensation. Suppose a person under obligation to furnish a minor apprentice with common school instruction for a given period: would not the violation of that duty furnish a claim for damages? The injury would be of the same character which a child suffers from the loss of the training and instruction which it is entitled to receive from its parents. The injury in these cases is not pecuniary in a very strict sense of the word, but it belongs to that class of wrongs as distinguished from injuries to the feelings and sentiments; and in my view, therefore, it falls within the term as used in the statute." Tilley v. Hudson River R. Co., 1862, 24 N.Y. 471.

Mrs. Rogow testified that decedent "was probably one of the most devoted fathers I ever saw in my life." (Tr. 105.) According to her testimony Ro-

gow spent a great deal of time with his children and frequently worked nights so that he could be free during the day to be with them. "He was a born pedagogue, he loved to teach, and he taught them things all the time." (Tr. 105.)

Mr. Rogow was a well educated man of considerable intellectual achievement. He was obviously well equipped to provide his children with training and guidance of educational value to them. Such close personal tutelage from a man of Rogow's abilities would have considerable pecuniary value. The children were both very young at the time of their father's death. Had he lived they would have received the benefit of his training and guidance for many years. Indeed, its value would probably have increased as they matured and began to approach their respective careers.

I know of no precise mathematical formula which I may employ in ascertaining the value of the lost parental guidance and training. However, in view of the high cost of education today, the yearly expense of providing the children with a substitute for the lost high calibre instruction of their father would be considerable. The children had a right to expect that such teachings would be available to them at least until they had reached their college years. Thus, they are entitled to be recompensed for the value of care and training equivalent to that which would have been offered to them by their father for a minimum period of 13 and 15 years respectively. In view of the foregoing, I find that $20,000 per child is a reasonable award for the deprivation of parental care and guidance. The funeral bill was $877.05. Thus I find that the total damages sustained by the beneficiaries of Leon Rogow was $242,987.05.[3]

The foregoing will constitute the findings of fact and conclusions of law of the court under Rule 52, Federal Rules of Civil Procedure, 28 U.S.C.

---

3. Contribution            $202,110.00
    Parental care & guidance    40,000.00
    Funeral bill              877.05
                           ————
      Total   $242,987.05